United States District Court
District Of Maine

Dupreme Ammonds,               )
                                   )
              Plaintiff      )
                                   )
                 v.        )      No.
                                   )
Puritan Medical Products Company, LLC,  )
                                   )
           Defendant.     )

## Complaint for Race Discrimination and Retaliation; Injunctive Relief Sought; and Demand for Jury Trial

Plaintiff Dupreme Ammonds complains against Defendant Puritan

Medical Products Company, LLC ("Puritan") as follows:

### Summary of the Action

1.     Dupreme Ammonds, a Black and Hispanic man, was forced to

leave his position at Puritan Medical Products Company in Guilford, Maine,

after suffering from severe and pervasive race-based harassment and

retaliation for over a year from both managers and coworkers.

2.     The harassment included multiple instances of white coworkers

calling Mr. Ammonds the full "N-word" or purposefully using it in front of

him, and repeatedly and pointedly using the word "niggardly" around him. A

coworker told Mr. Ammonds that there are "sundown towns"—referring to

towns where people of color cannot stay past sundown without risking their

1

safety—in Maine, and that he "better leave before the sun goes down or they will string you up." Coworkers also made frequent jokes about Mr. Ammonds's genitals, referencing a racist stereotype of Black men.

3.    In another instance, one of the most frequent and hateful harassers of Mr. Ammonds called Mr. Ammonds a series of racial slurs and, when he was confronted about his racism by a different coworker, he responded, "What is he going to do? He has to take it." After Mr. Ammonds reported this abuse, the harasser physically assaulted Mr. Ammonds at work.

4.    Mr. Ammonds reported the repeated abuse to both managers and human resources, but they did not intervene, and the harassment became increasingly vile.

5.    Several of Mr. Ammonds's white coworkers also reported the racist abuse that they witnessed against Mr. Ammonds. Rather than take remedial action, Puritan threatened these coworkers' jobs.

6.    Eventually, Mr. Ammonds was transferred to a new station, but the abuse continued. Again, a coworker repeatedly harassed Mr. Ammonds based on his race, including using the full "N-word" in front of him and calling him a "little monkey." Despite Puritan's history of ignoring or refusing to take remedial action in response to Mr. Ammonds's reports, he continued to submit complaints to management and HR about the racist abuse he faced.

7.     Eventually, the cumulative weight of the harassment and Puritan's complete failure to act on it became so injurious to Mr. Ammonds's mental and emotional health that he was forced to take a leave of absence. Puritan has still not taken any remedial or ameliorative action to make his workplace a safe or bearable place to work for Mr. Ammonds or other people of color.

8.     Mr. Ammonds brings this civil action to remedy unlawful race discrimination and retaliation in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Maine Human Rights Act.

## Parties

9.     Mr. Ammonds is a citizen of the United States and lives in Hartland, Somerset County, Maine.

10.     Puritan is a limited liability company organized and existing in the State of Maine. Puritan's principal place of business is located at 31 School Street, Guilford, Maine 04443.

## Jury Trial Demand

11.     Plaintiff demands trial by jury on all issues triable by jury.

## Jurisdiction and Venue

12.     This action arises under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17 (Title VII); and the Maine

3

Human Rights Act, 5 M.R.S. §§ 4551-4634 (MHRA). This Court has proper

subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C.

§§ 1331 (federal question) and 1343 (civil rights), and supplemental

jurisdiction over Plaintiff's state law MHRA claims under 28 U.S.C.

§ 1367(a).

13.     Venue is proper in the District of Maine under 28 U.S.C.

§ 1391(b)(1)(2) because (1) Puritan resides in Maine; and (2) a substantial

part of the events or omissions giving rise to the claim occurred in Maine.

Under Rule 3(b) of the Rules of this Court, this action is properly filed in

Bangor because Somerset County is "the county in which a substantial part

of the events or omissions giving rise to the claim occurred."

## Facts

14.     Plaintiff Dupreme Ammonds is a Black and Hispanic adult man.

15.     Mr. Ammonds began working for Puritan in its Pittsfield, Maine,

location on about January 11, 2021.

16.     Soon after he started, Mr. Ammonds was subjected to racist

comments. For example, in about February of 2021, a co-worker loudly asked

Mr. Ammonds if his hair grows "into a Michael Jackson afro everywhere" in

front of a group of his co-workers, including supervisors (which Puritan refers

to as "team leads"). The coworker went on to ask if his under-arms, buttocks, chest, or genital area grew hair in an afro style.

17.    The group of co-workers all appeared to find this to be an amusing conversation, even though it was very embarrassing and offensive to Mr. Ammonds based on his race.

18.    In late March or early April 2021, after returning from the restroom, Mr. Ammonds saw his manager, Lisa Presby, laughing and standing with a coworker named Pamela Reynolds, who looked uncomfortable. Mr. Ammonds asked Ms. Presby what they were joking about.

19.    Ms. Presby asked Mr. Ammonds, "Are you one of the sensitive ones?" She further clarified, "I didn't know if you were one of those that can't take a joke." Ms. Presby's use of "ones" and "one of those" revealed Ms. Presby's reliance on stereotypes. Despite her racist question, Mr. Ammonds responded that he likes jokes and comedy.

20.    Ms. Presby then relayed that she had asked Ms. Reynolds where Mr. Ammonds was, and when Ms. Reynolds replied that he went to the bathroom, Ms. Presby joked, "Geez, where the fuck did he go to? Fucking Africa?"

21.    In late April or early May 2021, Ms. Reynolds was speaking with Ms. Presby about how people had commented that she had a "big, black girl ghetto booty." Ms. Reynolds and Ms. Presby laughed. Ms. Presby then

addressed Mr. Ammonds and asked if the "black rumor" was true. When Mr. Ammonds asked for clarification, Ms. Presby said, "You know, are the black ones as big as they say?"

22.    Mr. Ammonds reported this conversation to Puritan's human resources department and several higher ups at Puritan, including Richard Bubar and Jim Stacey, both of whom dismissed the complaint with comments along the lines of that she was a new supervisor and was still learning. By immediately dismissing his complaint, Puritan's human resources and management both failed to investigate a claim of discrimination by a supervisor against her supervisee and showed Mr. Ammonds that his complaints of discrimination would not be taken seriously.

23.    One co-worker, a white man named Willie Ashe, subjected Mr. Ammonds to particularly egregious racism. Mr. Ashe was a relatively recent hire, and was apparently a personal friend of Ms. Presby, as the two regularly ate lunch and spent their breaks together.

24.    Beginning in about May 2021, Mr. Ashe started consistently commenting about Mr. Ammonds's race, despite Mr. Ammonds's repeated requests that Mr. Ashe stop and his complaints to their supervisors.

25.    Mr. Ashe would ask questions to Mr. Ammonds such as, "Does your hair break combs?" and, "With your skin color, can you even get a sunburn?" Mr. Ammonds initially took these types of racially insensitive

questions at face value, but it quickly became clear that Mr. Ashe was mocking him.

26.     The racial bullying continued despite Mr. Ammonds making clear that he was not comfortable with the racial harassment being directed at him. Indeed, because Mr. Ashe faced no repercussions for this behavior from supervisors, human resources, and management despite Mr. Ammonds complaints, Mr. Ashe became increasingly emboldened.

27.     Mr. Ashe would say things like, "You know you can't go to certain places in Maine, right?" and, "There are sundown towns around here, and if you go, you better leave before the sun goes down or they will string you up." These clearly threatening statements were meant to intimidate and belittle Mr. Ammonds.

28.     Mr. Ashe also frequently relied on stereotypes, including making comments like, "Yeah, I'm big, but Dupreme probably has a donkey cock!" Mr. Ashe also would take a vacuum head from a vacuum in the room, hold it near his crotch, and say, "Hey, Dupreme, does this look familiar?" This was clearly a phallic reference.

29.     In another instance, one of Mr. Ammonds's co-workers found a black mixing stick at her station and asked, "Who's black stick is this?" Mr. Ashe responded loudly, "Dupreme! Dupreme!" before calling Mr. Ammonds over to insult him based upon his race.

30.    In another instance, Mr. Ashe approached Mr. Ammonds from behind, stuck two of his fingers in Mr. Ammonds's back to simulate a gun, and said to Mr. Ammonds, "Just in case you miss home."

31.    Mr. Ashe would also frequently use the world "niggardly" around Mr. Ammonds, as it sounds similar to the n-word. Mr. Ashe further felt that it was acceptable behavior to use the n-word in the workplace, and around Mr. Ammonds, which occurred in front of co-workers and supervisors.

32.    Most or all of these incidents were witnessed by co-workers, team leads, and managers. Mr. Ammonds also complained about these incidents to Ms. Presby and to Tracey Brawn in human resources. They did not stop the harassment. By consistently ignoring Mr. Ammonds's complaints of discrimination, Puritan's human resources and management employees rendered Puritan's discrimination and harassment procedures effectively non-existent.

33.    In about June 2021, Mr. Ammonds mentioned that his grandfather was Hispanic. Later that day, Mr. Ashe made an "art project" out of posterboard and cut-outs made from company shipping materials. He showed it to Mr. Ammonds and their coworkers. It depicted what appeared to be three Hispanic men, an airport hangar, an airplane, and a police vehicle.

34.    Mr. Ashe said, "Hey Dupreme, look at these Latinos trying to bring drugs into the country, but the cops caught their stupid asses." Mr.

8

Ashe further made several other crude comments and jokes about Mr. Ammonds and the people depicted on the posterboard. Mr. Ammonds complained to his supervisor, Mr. Presby, but she also found the posterboard humorous.

35.    In another disturbing instance, Mr. Ashe was making his customary racist comments towards Mr. Ammonds. A tech walked up to Mr. Ashe and said, "That's not cool, you need to stop. It's 2021." Mr. Ashe responded, "What is he going to do? He has to take it."

36.    Mr. Ammonds again complained about the comments, this time to Ms. Brawn in human resources. After months of reported harassment, Ms. Brawn finally took minor corrective action. In response to Mr. Ashe's documented severe and pervasive racial harassment against Mr. Ammonds, Ms. Brawn simply sent Mr. Ashe home for the day.

37.    When Mr. Ashe returned to work the next day, he physically assaulted Mr. Ammonds by shoving him from behind while he was working. Mr. Ashe then made a series of vitriolic racist comments in front of Mr. Ammonds, Ms. Presby, and other coworkers.

38.    Puritan finally terminated Mr. Ashe after he physically assaulted Mr. Ammonds in front of supervisors.

39.    After Mr. Ashe was fired, the harassment against Mr. Ammonds escalated, as apparently Mr. Ashe was a popular employee and many co-

workers were unhappy at what they perceived as Mr. Ammonds getting Mr. Ashe fired by complaining of racial discrimination and harassment.

40.     For example, his supervisor, Ms. Presby, retaliated against Mr. Ammonds complaints of racial discrimination by "cracking down" on him. She told Mr. Ammonds that he was "talking" and "walking around" too much. She also said that he, unlike his white coworkers, had to stay at his station for his entire shift and not engage in conversation with anyone. Ms. Presby did not make these criticisms before Mr. Ashe's termination, nor did she make them against similarly situated white employees.

41.     Four of Mr. Ammonds co-workers complained about the harassment and racist treatment of Mr. Ammonds. Ms. Brawn replied by bringing the group of complaining co-workers into a conference room and accusing them of trying to "start a petition" to get rid of their supervisor, Ms. Presby, who had been the subject of some of their complaints for her racist behavior toward Mr. Ammonds.

42.     Ms. Brawn told the group that their complaints against Ms. Presby were harassment, and that any further complaints that Ms. Presby discriminated against Mr. Ammonds would be met with their immediate termination. Ms. Brawn's comments explicitly ended the workers' ability to bring complaints of race discrimination to Puritan's management or human resources.

10

43.     Throughout this entire ordeal, Mr. Ammonds's mental health was deteriorating due to the constant racial harassment, discrimination, and retaliation from co-workers and supervisors, and the extreme indifference of—if not encouragement by—upper management and human resources.

44.     On about November 2, 2021, Mr. Ammonds called out of work. While leaving a message on the call-out line voicemail, he said that Ms. Presby had made his life "a living hell." He reiterated the worst aspects of the horrific harassment he had faced at Puritan.

45.     When Mr. Ammonds returned to work the next day, Ms. Brawn retaliated against him for his complaints about the repeated racial harassment by several coworkers and Ms. Presby by reassigning him from the "flock room" to the "multi-vac room."

46.     With the exception of Willie Ashe—who had also physically assaulted Mr. Ammonds—Puritan did not discipline the employees who had harassed and discriminated against Mr. Ammonds. None of them were reassigned—only Mr. Ammonds was.

47.     Mr. Ammonds told his new supervisor, Eric Young, that he wished to file a formal complaint against Ms. Presby for racial discrimination. Mr. Young told him that he did not need to write a statement, he needed to "get back to work." Puritan's discrimination and harassment procedures were thus closed again to Mr. Ammonds.

11

48.    Multiple co-workers told Mr. Ammonds that management felt he was causing trouble and that they were looking for a pretext to fire him.

49.    This seemed to embolden other employees, including a co-worker named Connor Lambert, who repeatedly subjected Mr. Ammonds to racist behavior similar to what Mr. Ashe had done. For example, Mr. Lambert made repeated comments about how Black women should be out "picking cotton." He also made repeated crude comments about the genitalia of Black women.

50.    Mr. Lambert also directed his racist vitriol at Mr. Ammonds specifically, including calling him a "little monkey." Mr. Lamber also asked Mr. Ammonds, "If we can choose what gender or what we identify as, can I identify as a Black man so I can say 'what's up, my n----r?' and call people n----rs?"

51.    Like Mr. Ashe, Mr. Lambert also seemed to find the word "niggardly" humorous. He used the word regularly, and also constantly made racist "jokes" targeted at Mr. Ammonds. Other staff at Puritan apparently found these jokes funny, as they laughed at Mr. Ammonds and did not oppose the harassment. Managers and team leads also joined in laughing at and mocking Mr. Ammonds due to his race.

52.    On April 14, 2022, Puritan management again retaliated against Mr. Ammonds by placing him under investigation for the plainly pretextual reason that he expressed interest in Mixed Marshall Arts. Mr. Ammonds had

mentioned to a coworker that he thought Rhonda Rousey, a female former Mixed Martials Artist, could beat Bruce Lee, a male former actor, in a hypothetical fight.

53.     Upon information and belief, a co-worker, seemingly as a joke to make fun of Mr. Ammonds for complaining about the serious and repeated racial harassment he was subjected to over the course of his employment with Puritan, reported Mr. Ammonds to human resources for his comment. He told HR that talking about professional fighters "triggered his childhood trauma" and "memories of his father beating him."

54.     Human resources reprimanded Mr. Ammonds and told him to be mindful of how his words could hurt others. This alone was more discipline than other employees faced for the heinous racism they directed at Mr. Ammonds on a near daily basis.

55.     Upon information and belief, that same co-worker was later observed in a deep conversation with another co-worker in which they discussed and acted out MMA moves while on break. Another co-worker reported that conversation to human resources, but nothing ever came of the fact that a co-worker was harassing Mr. Ammonds by filing frivolous reports with human recourses.

56.     This campaign of discrimination and harassment was constant and ongoing. Coworkers and supervisors alike participated in the hostility.

13

When Mr. Ammonds or his sympathetic coworkers reported the abuse to human resources or upper management, they were either ignored, threatened, or overtly retaliated against.

57.    In about April 2022, Mr. Ammonds's primary care provider, Nurse Practitioner Serenity Bartlett, referred him to a therapist to help him deal with the severe anxiety and mental health issues that arose from the horrific treatment at Puritan. Mr. Ammonds began therapy and, upon the advice of his medical provider, took a leave of absence from Puritan. Mr. Ammonds has since been diagnosed with PTSD and anxiety following the discrimination and harassment he experienced at Puritan.

58.    Puritan has taken no constructive or ameliorative steps toward making its factory into a safe place for people of color to work. By allowing an ongoing hostile work environment to persist against Mr. Ammonds and retaliating against him for reporting racial harassment, Puritan constructively discharged him.

## Exhaustion of Administrative Procedures

59.    On July 15, 2022, Mr. Ammonds filed a charge of race discrimination and retaliation against Puritan with the Equal Employment Opportunity Commission (EEOC).

60.    The EEOC issued a Notice of Right to Sue on February 21, 2024.

61.    Mr. Ammonds has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Legal Claims

62.    The facts above are realleged.

63.    Puritan intentionally discriminated against Mr. Ammonds, including by subjecting him to a hostile work environment, because of his race (including his ancestry and ethnic characteristics) and in retaliation for him engaging in protected activity by reporting and opposing unlawful discrimination, in violation of 42 U.S.C. § 1981, Title VII, and the Maine Human Rights Act.

64.    Puritan constructively discharged Mr. Ammonds by subjecting him to a level of discrimination and retaliation that made his working conditions intolerable and more unpleasant than any reasonable person would be expected to bear, in violation of 42 U.S.C. § 1981, Title VII, and the MHRA.

65.    Puritan acted with malice or with reckless indifference to Mr. Ammonds's rights under 42 U.S.C. § 1981, Title VII, and the MHRA.

66.    Mr. Ammonds is pursuing all possible methods of proving this discrimination, including but not limited to, circumstantial and direct evidence, pretext evidence, evidence of deviation from standard practice, as

15

well as causation based on a single unlawful motive and mixed motives, including an unlawful motive. Each of his protected traits and protected activities was a factor that made a difference in Puritan's decision to impose adverse actions, in other words a but-for cause.

67.    As a direct and proximate result of Puritan's intentional discrimination and retaliation, Mr. Ammonds has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of his job and life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

68.    Puritan acted with malice and reckless indifference to Mr. Ammonds's rights under Civil Rights Statutes through its discriminatory and retaliatory conduct toward Mr. Ammonds.

69.    Mr. Ammonds respectfully requests that this Court enter a judgment against Puritan containing the following relief:

a)     An order declaring Defendant has violated 42 U.S.C. § 1981, Title VII, and the MHRA;

b)     An order enjoining Defendant from engaging in the unlawful activities alleged above;

      c)     An order awarding monetary damages in recognition of Plaintiff's past and future economic losses sustained as a result of Defendant's violations of 42 U.S.C. § 1981, Title VII, and the MHRA;

      d)     An order awarding compensatory damages to Plaintiff arising from the emotional distress, mental anguish, humiliation, and embarrassment caused by Defendant's unlawful conduct;

      e)     An order awarding punitive damages to Plaintiff;

      f)     An order awarding pre- and post-judgment interest to Plaintiff;

      g)     An award of Plaintiff's reasonable attorney's fees and expenses;

      h)     An award of other make-whole remedies including compensation for the adverse tax consequences of receiving compensation for lost wages and benefits in one calendar year;

      i)     An award of nominal damages if the jury awards no compensatory damages; and

      j)     Any such other and further relief this court deems just and equitable.

Respectfully submitted,

Date: May 20, 2024          /s/ David G. Webbert
                            David G. Webbert, Esq.
                            Johnson & Webbert, LLP
                            1 Bowdoin Mill Island, Ste. 300
                            Topsham, ME 04086

Tel: (207) 623-5110
dwebbert@work.law

/s/ Braden A. Beard
Braden A. Beard, Esq.
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: (207) 623-5110
bbeard@work.law

/s/ Ryan M. Schmitz
Ryan M. Schmitz, Esq.
Johnson & Webbert, LLP
1 Bowdoin Mill Island, Ste. 300
Topsham, ME 04086
Tel: (207) 623-5110
rschmitz@work.law

Matthew J. Blit, Esq.
(*Pro Hac Vice* Application Forthcoming)
Justin Clark, Esq.
(*Pro Hac Vice* Application Forthcoming)
Levine & Blit, PLLC
800 Westchester Ave., S-322
Rye Brook, NY 10573
Tel: (212) 967-3000
mblit@levineblit.com
jclark@levineblit.com

*Attorneys for Plaintiff*